Filed 11/19/15  P. v. Wells CA3

**NOT TO BE PUBLISHED**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C076411 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F02988) |
| v. | |
| CHRISTOPHER KELLY WELLS et al., | |
| Defendants and Appellants. | |

A jury found codefendants Christopher Kelly Wells and Elisha Jean Simpson guilty of various criminal charges and found true various special allegations against each of them.  In a bifurcated proceeding, the trial court found true two prior strike conviction allegations as to Wells.

On appeal, Wells asserts that (1) the trial court abused its discretion and violated his rights under the United States Constitution by granting the prosecution's motion to amend the consolidated information as to the allegation of a 1994 prior conviction for

1

violating Penal Code section 245, subdivision (a)(1) (hereafter section 245(a)(1));[1] (2) the trial court's true finding as to the 1994 prior conviction allegation was not supported by substantial evidence; and (3) his assault with a firearm conviction (count three) must be reversed in light of the jury's not true finding as to the related firearm use allegation. He also contends there are several clerical errors in the abstracts of judgment that require correction.

We agree that the abstracts require correction. We will order the abstracts corrected and otherwise affirm the judgment as to Wells.

Appointed counsel for Simpson has asked this court to review the record to determine whether there exist any arguable issues on appeal. (*People v. Wende* (1979) 25 Cal.3d 436.) To that end, counsel filed an opening brief that sets forth the facts of the case and requests that we review the record and determine whether there are any arguable issues on appeal. (*Ibid*.) Simpson was advised by appointed counsel of the right to file a supplemental brief within 30 days of the date of filing of the opening brief. Simpson did file a supplemental opening brief in which she contends (1) her conviction for second degree robbery (count two) is not supported by substantial evidence; (2) she received ineffective assistance of counsel; and (3) there was insufficient evidence to support her conviction for first degree robbery (count one).

We affirm the judgment as to Simpson.

## FACTUAL BACKGROUND

*May 2013 Robbery of James Allenbaugh* (*Count One*)

In 1988, James Allenbaugh suffered a serious back injury for which he was prescribed various pain medications, including Vicodin, Oxycontin, and Fentanyl. He continued taking the pain medications and eventually became addicted to them.

---

[1] Undesignated statutory references are to the Penal Code.

In May 2013, Allenbaugh lived alone in an apartment in Sacramento. He owned approximately 15 guns, most of which he kept in a gun cabinet. Simpson, who Allenbaugh met three months prior, stopped by the apartment a couple of times a week. On occasion, they would use marijuana or methamphetamine together. Simpson introduced Allenbaugh to Wells, also known as "Roach." The three hung out at Allenbaugh's apartment approximately four or five times prior to May 20, 2013.

At approximately 2:00 a.m. on May 20, 2013, Simpson and Wells stopped by Allenbaugh's apartment for a visit. Allenbaugh was suffering from a migraine headache and back pain and was out of his pain medication. Wells and Simpson suggested that heroin might help ease his pain. Wells loaded three syringes with heroin, putting the same amount in two of the syringes and double the amount in the third syringe. Wells injected Allenbaugh with the fuller syringe, and Wells and Simpson injected themselves with the other two syringes. Allenbaugh was slightly uncomfortable using more than defendants, but agreed nonetheless because he was a little bit intimidated by Wells's size and believed Wells might harm him. He also believed the heroin might give him some relief from his migraine. Allenbaugh was immediately affected by the heroin and nodded off several times while sitting in his wheelchair.

A few hours later, defendants asked Allenbaugh if he wanted to go get coffee. Allenbaugh agreed and used his cane to walk to Simpson's car. Simpson drove in circles for 15 or 20 minutes, driving past two coffee shops several times. Simpson eventually stopped the car at an apartment complex about a block or two from Allenbaugh's apartment. Wells got out, said he "had some business to take care of," and walked away. Frustrated with driving around in circles, Allenbaugh got out of the car and said he was going to walk home. He began to walk, but had to stop twice and lay his head down because of his headache and his back. Simpson told him to get back in the car so she could give him a ride back to his apartment. When Allenbaugh got back in the car,

3

Simpson said she was going to get coffee and drove to a coffee shop much farther from Allenbaugh's apartment than other coffee shops. Simpson went in and got coffee while Allenbaugh stayed in the car.

Simpson drove Allenbaugh back to his apartment. Allenbaugh walked to the door and Simpson followed behind him and opened the gate for him. Allenbaugh opened the door to find the apartment "pitch black," which he found odd because he had left the lights and television on. Suddenly, Wells turned the lights on, put one of Allenbaugh's guns to Allenbaugh's head, and told him to get down. Allenbaugh thought Wells was kidding at first, but then realized he was "dead serious" and complied by lying down on the ground on his stomach. Wells told Simpson, who by then was also inside the apartment, to duct tape Allenbaugh's hands. She retrieved the tape from Allenbaugh's workbench and taped his hands behind his back. Wells instructed Simpson to "do what she needed to do." Allenbaugh could hear Simpson breaking the handle on the locked gun cabinet, and then ransacking his bedroom. When Simpson said she was done, Wells went into the bedroom and went through Allenbaugh's drawers. Suddenly, the apartment "got quiet" and Allenbaugh realized defendants had gone, leaving through the bedroom window. He used a knife to free himself from the duct tape.

On May 22, 2013, Sacramento County Sheriff's Deputy Brian Painter was dispatched to Allenbaugh's apartment after receiving a report of a home invasion robbery. Allenbaugh, who was accompanied by his sister, stated the crime occurred on May 20, 2013, but he did not immediately report it because he was afraid of defendants and feared retaliation. He described the firearms that were taken by defendants and Deputy Painter collected the duct tape Simpson used to bind his wrists together.

*June 2013 Robbery of Walmart* (*Count Two*)

On June 1, 2013, Brian Jenkins worked as a plain-clothed asset protection associate at Walmart. At approximately 7:00 p.m., Jenkins noticed Simpson in the

4

sporting goods area putting various pieces of camping equipment (including a camping stove) in her cart and rearranging and shifting the items around in the cart. Jenkins watched Simpson for a while, and then lost sight of her for a "minute or so" until he saw her leaving the store through the exit in the garden center. Believing Simpson had not paid for the merchandise, Jenkins hurried after her in an effort to apprehend her. In the meantime, Wells was interacting with the door greeter who was positioned at the entrance to the garden center. Jenkins later told law enforcement that, as Simpson exited the store, it appeared Wells was attempting to distract the greeter. The store's video surveillance recorded Simpson leaving the store through the garden center exit with a cart containing, among other things, the camping stove. The video also recorded Wells walking through the store with Simpson.

Jenkins followed Simpson into the parking lot after confirming with the greeter that Simpson had not shown her receipt for the merchandise. Unbeknownst to Jenkins, Wells followed behind him. When Jenkins caught up with Simpson, he identified himself as a member of Walmart's asset protection and instructed her to accompany him back into the store. However, Wells inserted himself between Jenkins and Simpson and, reaching for his waistband "like he was reaching for a weapon," told Jenkins in a threatening manner to "turn around and walk away." Jenkins backed away as Wells continued to walk toward him in a threatening manner and repeatedly told him to leave. When Jenkins turned to get the license plate information, Wells again walked toward him in a threatening manner. Simpson, Wells, and another woman quickly loaded the merchandise into the car and then drove quickly out of the parking lot.

*June 2013 Assault with Deadly Weapon on Woodvine* (*Count Three*)

On June 2, 2013, Richard Woodvine and his wife lived in a home in Antelope. His stepdaughter, Nicole Turknett, lived with them. Simpson and Wells were acquaintances of Turknett. They visited the home regularly, slept over on occasion, and

5

kept some of their clothing there. Woodvine drove a truck and was generally only home on weekends. He was not comfortable with defendants being in the house because he believed defendants were responsible for personal items such as tools and a cell phone missing from his home.

On June 1, 2013, defendants showed up together at the house. Woodvine told defendants he did not want them at the house and they needed to leave. When Wells said he needed to "get his stuff," Woodvine told him "his stuff wasn't there." Wells tried to get in but Woodvine stood in his way. Wells became angry. He told Woodvine, "I'm packing" and threatened to shoot him, and then pulled a gun out of his waistband and stuck it in Woodvine's stomach. Woodvine said, "[I]f you're going [to] shoot me, shoot me, because if you don't, I'm going to take it away from you and I'm going to shoot you." When Woodvine's wife yelled at Turknett to call the police, Wells and Simpson walked away. Police arrived the following day and took a report of the incident from Woodvine.

**PROCEDURAL SUMMARY**

Both defendants were charged by amended consolidated information and tried together by the same jury.

*Defendant Wells*

Wells was charged with first degree robbery of Allenbaugh (§ 211—count one), second degree robbery of Walmart/Jenkins (§ 211—count two), and assault with a firearm on Woodvine (§ 245, subd. (a)(2)—count three). The amended information alleged Wells personally used a firearm as to count one (§ 12022.53, subd. (b)) and as to count three (§ 12022.5, subds. (a) & (d)). The amended information further alleged Wells suffered a prior serious and violent felony conviction for assault with a deadly weapon (§ 245(a)(1)), and a prior serious and violent felony conviction for first degree

6

burglary (§ 459), both of which are strikes within the meaning of sections 667, subdivision (e)(2) and 1170.12, subdivision (c)(2).

The jury found Wells guilty of all three counts. The jury also found true the allegation that he personally used a firearm (§ 12022.53, subd. (b)), but found not true the allegation that, as to count three, he personally used a firearm (§ 12022.5, subds. (a) & (d)). In a bifurcated proceeding, the court found true the prior conviction and prior strike allegations.

The court found Wells ineligible for probation and sentenced him to an indeterminate sentence of 76 years to life, plus a determinate sentence of 40 years in state prison (the breakdown of which is discussed in detail in part 4.0 of this opinion, *post*). The court also imposed various fees and fines, and awarded Wells 348 days of presentence custody credit (303 actual days plus 45 conduct credits).

*Defendant Simpson*

Simpson was also charged with first degree robbery of Allenbaugh (count one) and second degree robbery of Walmart/Jenkins (count two). The amended information alleged that, as to count one, she was armed with a firearm. (§ 12022, subd. (a)(1).)

The jury found Simpson guilty of both counts and found true the arming allegation.

The court found Simpson ineligible for probation and sentenced her to the middle term of four years on count one, plus a consecutive one-year term for the arming enhancement and one year (one-third the middle term) for count two, for an aggregate term of six years in state prison. The court also imposed a $280 restitution fine (§ 1202.4), a $280 parole revocation fine, stayed pending successful completion of parole (§ 1202.45), a $600 victim restitution fine to Walmart (reserving for later hearing the amount of victim restitution to be paid to Allenbaugh and Woodvine), a $90 court facility fee (Gov. Code, § 70373), and a $60 court operations assessment (§ 1465.8, subd. (a)(1)),

ordered that all mandatory fines be set at the minimum allowed by statute, and waived all other nonmandatory fees and fines. Simpson was awarded 348 days of presentence custody credit (303 actual days plus 45 conduct credits).

Both defendants filed timely notices of appeal.

## DISCUSSION

**1.0  Amendment of Consolidated Information—Wells**

Wells contends the trial court abused its discretion when it allowed amendment of the information, changing the allegation of a prior 1994 conviction for violation of section 245(a)(1) from assault by means of force likely to cause great bodily injury to assault with a deadly weapon. The claim lacks merit.

1.1  Background

Wells waived his right to a jury trial on the prior conviction allegations on March 26, 2014. On April 25, 2014, prior to the court trial on the alleged priors, the prosecution requested that the court amend by interlineation the information to allege the crime of "assault with a deadly weapon, not assault by means of force likely to cause great bodily injury." Over defense counsel's objection, the trial court granted the prosecution's request stating, "I do not find that the requested amendments by interlineation change any true substantive aspect of the pleading. Obviously, they are simply brought forward at this time to conform to the exhibits that we have in support of the priors trial."

1.2  Law

Due process requires that the defendant receive notice of the charges against him adequate to provide a meaningful opportunity to defend against them. (*People v. Seaton* (2001) 26 Cal.4th 598, 640; *People v. Fernandez* (2013) 216 Cal.App.4th 540, 554.) Generally, the preliminary hearing transcript provides the accused with the nature of the

charges against the defendant, satisfying the due process requirement. (*People v. Jones* (1990) 51 Cal.3d 294, 317-318.)

Amendments to an information in a criminal case are governed by section 1009, which provides in relevant part as follows: "The court in which an action is pending may order or permit an amendment of an . . . information . . . for any defect or insufficiency, at any stage of the proceedings, . . . and the trial or other proceeding shall continue as if the pleading had been originally filed as amended, unless the substantial rights of the defendant would be prejudiced thereby . . . ." If an amendment is allowed after the defendant has waived his or her right to a jury trial, a new jury waiver is required only if the amendment establishes a new offense or is otherwise considered substantial. (*People v. Gary* (1968) 263 Cal.App.2d 192, 197; accord, *People v. Fernandez*, *supra*, 216 Cal.App.4th at p. 554 [section1009 allows an amendment at any stage of the proceedings provided the amendment does not prejudice the substantive rights of the defendant and does not charge an offense not shown by the evidence taken at the preliminary hearing].)

The trial court's exercise of its discretion to grant a motion to amend under section 1009 is broad and will not be disturbed on appeal absent a clear abuse of discretion. (*People v. Jones* (1985) 164 Cal.App.3d 1173, 1178-1179.)

*Analysis*

Wells had adequate notice of the prior strike allegation regarding his 1994 assault conviction for violating section 245(a)(1). The charging documents—the criminal complaint filed June 6, 2013, the consolidated information filed October 25, 2013, and the amended consolidated information filed March 11, 2014—all alleged Wells suffered a prior "serious and violent felony: the crime of Assault By Means of Force Likely to Cause Great Bodily Injury in violation of Section 245(a)(1) of the Penal Code, and is

eligible for a three-strikes life sentence within the meaning of Penal Code Sections 667[, subdivision] (e)(2)(C) and 1170.12[, subdivision] (c)(2)(C)."

By virtue of the charging documents, Wells was on notice of the alleged prior strike. Defense counsel acknowledged as much during the August 29, 2013 preliminary hearing, noting "the '94 case, if indeed it's a strike, it's alleged as such."

Wells asserts the trial court's exercise of discretion in deciding the motion to amend should have included consideration of the following factors set forth in *People v. Valladoli* (1996) 13 Cal.4th 590: "(i) the reason for the late amendment, (ii) whether the defendant is surprised by the belated attempt to amend, (iii) whether the prosecution's initial failure to allege the prior convictions affected the defendant's decisions during plea bargaining, if any, (iv) whether other prior felony convictions had been charged originally, and (v) whether the jury has already been discharged." (*Id.* at pp. 607-608.) Wells argues the *Valladoli* factors favored denial of the motion because the request to amend came very late in the proceedings and after the jury had already been discharged, the prosecutor gave no "proper reason" for the delay in seeking amendment, and the "belated attempt" to amend came as a surprise to Wells.

In *Valladoli*, the defendant unsuccessfully challenged the Court of Appeal's decision allowing postverdict amendment of the information to include prior felony convictions mistakenly stricken from the complaint. There, the defendant argued section 969a, which applies when " 'a pending indictment or information does not charge all prior felonies of which the defendant has been convicted,' " did not permit such postverdict amendment and violated his federal and state rights to due process and protections against double jeopardy. (*People v. Valladoli*, *supra*, 13 Cal.4th at pp. 594-595, 605, 609.)

Here, on the other hand, the prosecution was not attempting to amend the information to include prior convictions not previously alleged. Rather, the prosecution

sought, and the trial court allowed, amendment of the *existing* prior strike allegations to conform to the evidence.

Wells contends the amendment resulted in a substantive change in that the existing allegation of assault by means of force likely to produce great bodily injury required proof of additional facts in order to constitute a serious felony. He argues the amendment does not conform the allegations to the exhibits, as evidenced by the notation on the 1994 abstract of judgment indicating defendant's conviction for "ASSAULT GREAT BODILY IN[JURY]." We disagree.

As previously discussed, the charging documents consistently alleged Wells's 1994 conviction for violating section 245(a)(1) as a strike. The requested amendment neither added a new charge nor changed the existing strike allegation, other than to correct the description of the crime to conform to proof. In that regard, the evidence submitted in support of the allegation revealed that Wells was charged in 1994 with "assault great bodily injury *and with deadly weapon, in violation of Penal Code section 245(a)(1)*" by assaulting the victim "*with a deadly weapon . . . a sharpened instrument,* and by means of force likely to produce great bodily injury." (Italics added.) Indeed, Wells's own declaration twice states that Wells pleaded guilty to section 245(a)(1), "*assault with a deadly weapon.*" (Italics added.) Other 1994 trial court documents, including the abstract of judgment, reflect Wells's conviction for violating section "245(a)(1)." While the abstract also describes the crime as "ASSAULT GREAT BODILY IN[JURY]," that description is inconsistent with Wells's declaration regarding his plea.

We conclude the amendment conformed the amended consolidated information to proof and did not result in a substantive change to the charges against Wells. Therefore, the trial court did not abuse its discretion in granting the motion to amend.

11

**2.0   Sufficiency of Evidence to Support Prior Strike Conviction—Wells**

Wells contends there was insufficient evidence to support the trial court's finding that his 1994 conviction for violation of section 245(a)(1) was a serious felony within the meaning of the three strikes law.  The claim lacks merit.

As set forth in *People v. Delgado* (2008) 43 Cal.4th 1059 (*Delgado*), "[t]he People must prove each element of an alleged sentence enhancement beyond reasonable doubt.  [Citation.]  Where, as here, the mere fact that a prior conviction occurred under a specified statute does not prove the serious felony allegation, otherwise admissible evidence from the entire record of the conviction may be examined to resolve the issue.  [Citations.]

"A common means of proving the fact and nature of a prior conviction is to introduce certified documents from the record of the prior court proceeding and commitment to prison, including the abstract of judgment describing the prior offense.  [Citations.]

" '[The] trier of fact is entitled to draw reasonable inferences from certified records offered to prove a defendant suffered a prior conviction . . . .'  [Citations.]  . . .

"Thus, if the prosecutor presents, by such records, prima facie evidence of a prior conviction that satisfies the elements of the recidivist enhancement at issue, and if there is no contrary evidence, the fact finder, utilizing the official duty presumption, may determine that a qualifying conviction occurred.  [Citations.]

"However, if the prior conviction was for an offense that can be committed in multiple ways, and the record of the conviction does not disclose how the offense was committed, a court must presume the conviction was for the least serious form of the offense.  [Citations.]  In such a case, if the statute under which the prior conviction occurred could be violated in a way that does not qualify for the alleged enhancement, the evidence is thus insufficient, and the People have failed in their burden.  [Citations.]

12

"On review, we examine the record in the light most favorable to the judgment to ascertain whether it is supported by substantial evidence. In other words, we determine whether a rational trier of fact could have found that the prosecution sustained its burden of proving the elements of the sentence enhancement beyond a reasonable doubt." (*Delgado*, at pp. 1065-1067.)

Section 245(a)(1) "punishes assault committed *either* by means 'likely to produce great bodily injury' (GBI), *or* by use of 'a deadly weapon . . . other than a firearm.' Only the latter version qualifies as a serious felony." (*Delgado*, *supra*, 43 Cal.4th at p. 1063.)

At the time of Wells's prior conviction in 1994, section 245(a)(1) defined assault to include, "[a]ny person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm *or* by any means of force likely to produce great bodily injury . . . ." (Former § 245, subd. (a)(1), italics added, as amended by Stats. 1993, ch. 369, § 1.)

As proof of Wells's 1994 conviction, the People introduced a packet of certified documents, including the felony complaint, the trial court's felony docket and minute order after pronouncement of judgment, defendant's declaration of guilty plea, and the abstract of judgment. The charging complaint alleged Wells committed "assault great bodily injury *and with deadly weapon*, in violation of Penal Code section 245(a)(1)" *by assaulting the victim "with a deadly weapon . . . a sharpened instrument*, and by means of force likely to produce great bodily injury." (Italics added.) Wells's declaration attests to the charge against him of "P.C. 245a(1) [*sic*] *assault with a deadly weapon*," and reflects his plea of guilty to "P.C. 245a(1) [*sic*] *assault with a deadly weapon*." (Italics added.) The abstract of judgment noted that, on July 21, 1994, Wells was convicted of section "245(a)(1)" for the crime of "ASSAULT GREAT BODILY IN[JURY]." The remainder of the documents in the packet reflected Wells's conviction

13

for violating section 245(a)(1) without further explanation. Wells did not present any evidence regarding the prior conviction.

While the 1994 abstract refers only to the great bodily injury prong of section 245(a)(1), that notation is contradictory to Wells's own declaration, the authenticity and admissibility of which is not in dispute, that he pleaded guilty to section 245(a)(1) "assault with a deadly weapon." Given that the declaration reflects Wells's own attestation, the contradictory clerical notation in the abstract does not reliably indicate Wells's prior conviction was for anything other than assault "with a deadly weapon."

Wells notes the trial court failed to make a specific finding that the evidence established the prior conviction was for assault with a deadly weapon, an objection he did not lodge below. To the extent this observation, made in passing and without citation to authority, is intended to constitute an argument, it must be deemed forfeited. (Cal. Rules of Court, rule 8.204(a)(1)(B) [each point in appellate brief must be supported by citation of authority]; *Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 [lack of authority or analysis constitutes forfeiture].)

We conclude there is substantial evidence to support the trial court's finding that Wells's 1994 conviction for violating section 245(a)(1) was a serious felony within the meaning of the three strikes law.

### 3.0    Conviction for Assault with a Firearm—Wells

The jury found Wells guilty of assault with a firearm (§ 245, subd. (a)(2)—count three), and found not true the allegation that he personally used a firearm during commission of that offense (§ 12022.5, subd. (a)). Wells contends the jury's not true finding resulted in inconsistent verdicts.

"As a general rule, inherently inconsistent verdicts are allowed to stand. [Citations.] For example, 'if an acquittal of one count is factually irreconcilable with a

14

conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both.' [Citation.] Although ' "error," in the sense that the jury has not followed the court's instructions, most certainly has occurred' in such situations, 'it is unclear whose ox has been gored.' [Citation.] It is possible that the jury arrived at an inconsistent conclusion through 'mistake, compromise, or lenity.' [Citation.] Thus, if a defendant is given the benefit of an acquittal on the count on which he was acquitted, 'it is neither irrational nor illogical' to require him to accept the burden of conviction on the count on which the jury convicted." (*People v. Avila* (2006) 38 Cal.4th 491, 600.)

Wells concedes the general rule in *Avila*, but argues there is an applicable exception, known as the conspiracy exception, when " 'all of the essential elements of the crime of which the defendant was acquitted are identical to some or all of the essential elements of the crime of which he was convicted, and proof of the crime of which the defendant was acquitted is necessary to sustain a conviction of the crime of which the defendant was found guilty.' " (*People v. Pahl* (1991) 226 Cal.App.3d 1651, 1659.)

However, the court in *Pahl* made clear that the aptly named conspiracy exception applies *only* in conspiracy cases and refused to extend the rule to nonconspiracy cases, stating: "The fact that we . . . and other Courts of Appeal have stated the narrow conspiracy exception in broad language as if it might properly be applied in nonconspiracy cases does not render that a correct statement of law; it is not. The Legislature has decreed that an acquittal of one count shall not be deemed an acquittal on another count. The Supreme Court [in *In re Johnston* (1935) 3 Cal.2d 32] fashioned a very limited exception to that rule which applies only in cases where there is a conspiracy count. There is no conspiracy count here. Therefore, we reject appellant's contention." (*People v. Pahl*, *supra*, 226 Cal.App.3d at p. 1660.)

15

The same is true in the case before us.  Neither of the challenged verdicts related to charges or allegations of conspiracy.  Therefore, the conspiracy exception does not apply.

**4.0      Corrections to Abstracts of Judgment—Wells**

Wells contends, and the People agree, the abstracts of judgment for his determinate and indeterminate sentences contain clerical errors that must be corrected to reflect the judgment orally imposed by the trial court.  We agree.

The trial court sentenced Wells as follows:

Indeterminate sentence of 76 years to life:  as to count one, the upper term of six years, plus a consecutive 10-year term for the firearm enhancement and two consecutive five-year terms for the prior convictions (§ 667, subd. (a)), for a total of 26 years to life; as to count two, a consecutive term of 25 years to life (§ 667, subd. (e)(2)); and as to count three, a consecutive term of 25 years to life (§ 667, subd. (e)(2)).

Determinate sentence of 40 years:  ten years for the firearm enhancement (§ 12022.53, subd. (b)), plus two consecutive five-year terms as to each of the three counts for the prior convictions (§ 667, subd. (a)).

Neither the indeterminate abstract nor the determinate abstract is consistent with the sentence as pronounced by the trial court.  Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186; *People v. Mesa* (1975) 14 Cal.3d 466, 471.)  We consider the existing discrepancies to be clerical error.  Under our inherent power to correct such errors, we direct the trial court to correct the abstracts to accurately reflect the court's true judgment and sentence (*People v. Rowland* (1988) 206 Cal.App.3d 119, 123; *People v. Anthony* (1986) 185 Cal.App.3d 1114, 1125-1126) as follows:

16

The determinate sentence abstract must be corrected as follows: (1) In item 1, strike any and all references to a conviction on count one for "Robbery, 1st Deg," including the six-year sentence thereon; (2) in item 3, strike the three 10-year section 667, subdivision (a) enhancements (one of which leaves blank the space for "time imposed") and add four consecutive five-year section 667, subdivision (a) enhancements, for a total of 30 years; and (3) in item 8, modify the "Total Time" imposed from 56 years to 40.

The indeterminate sentence abstract must be corrected as follows: (1) In item 1, add the conviction for count one, pursuant to section 211, for "Robbery, 1st Deg," committed in "2013," with a conviction date of "03/28/14," convicted by "Jury," for a "Consecutive" sentence; and (2) in item 1, correct the date of conviction for counts two and three to reflect "03/28/14."

**5.0    Joinder in Claims Raised by Defendant Simpson—Wells**

Wells "joins in arguments made by [Simpson] in her opening brief that are applicable to him."

The People argue Wells has forfeited the issue for failure to make any particularized legal argument or cite to applicable authorities. (*People v. Bryant*, *Smith and Wheeler* (2014) 60 Cal.4th 335, 363-364.)

We agree with the People. "Purporting to join in a claim when no colorable argument can be made that the claim is applicable and preserved is akin to raising a frivolous claim in the first instance." (*People v. Bryant*, *Smith and Wheeler*, *supra*, 60 Cal.4th at p. 363.) It is not for us to determine which of Simpson's claims applies to Wells. "Appellate counsel for the party purporting to join some or all of the claims raised by another are obligated to thoughtfully assess whether such joinder is proper as to the specific claims and, if necessary, to provide particularized argument in support of his or her client's ability to seek relief on that ground. If a party's briefs do not provide legal

argument and citation to authority on each point raised, ' "the court may treat it as [forfeited], and pass it without consideration." ' " (*Id.* at pp. 363-364.)

**6.0    Substantial Evidence to Support Second Degree Robbery (Count Two) Conviction—Simpson**

Simpson contends her conviction for second degree robbery of Jenkins/Walmart (§ 211—count two) is not supported by substantial evidence that she used force or fear to take property from Jenkins/Walmart or that she was aware of or participated in any plan to do so.  We disagree.

In reviewing a challenge to the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence.  Substantial evidence is evidence that is credible, reasonable, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

We do not reassess the credibility of witnesses, and we draw all inferences from the evidence that support the jury's verdict.  (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.)  Unless it is physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Robbery is the taking of personal property from a person or the person's immediate presence by means of force or fear, with the intent to permanently deprive the person of the property.  (§ 211; *People v. Harris* (1994) 9 Cal.4th 407, 415.)  To support a robbery conviction, the evidence must show that the intent to steal arose either before or

18

during the commission of the act of force, otherwise the taking will at most constitute a theft. (*People v. Bolden* (2002) 29 Cal.4th 515, 556.)

" 'In this state, it is settled that a robbery is not completed at the moment the robber obtains possession of the stolen property and that the crime of robbery includes the element of asportation, the robber's escape with the loot being considered as important in the commission of the crime as gaining possession of the property. [Citations.] [¶] Accordingly, if one who has stolen property from the person of another uses force or fear in removing, or attempting to remove, the property from the owner's immediate presence, as defendant did here, the crime of robbery has been committed.' " (*People v. Villa* (2007) 157 Cal.App.4th 1429, 1433.)

As a preliminary matter, an appellant must present an analysis of the facts and legal authority on each point made, and must support the analysis with appropriate citations to the material facts in the record. If an appellant fails to do so, the argument is forfeited. (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 (*Duarte*).) Simpson failed to do so here.[2]

In any event, there is sufficient evidence the Walmart property was taken by means of force or fear. Simpson took the items from Walmart and walked out of the store without paying for them. As Walmart surveillance videotape and Jenkins's testimony confirm, Simpson headed to the exit while Wells attempted to distract the greeter from checking her receipt. Simpson made her way out of the store and began loading the stolen merchandise into a waiting car.

Jenkins followed Simpson in an attempt to apprehend her, not knowing Wells was following behind him. Jenkins testified that when he reached Simpson in the parking lot, he immediately identified himself as "asset protection for Wal-Mart" and told her she

---

[2] The sole record citation refers to the instructions given to the jury.

needed to come back to the store with him. At that point, Wells positioned himself between Jenkins and Simpson and, while reaching for his waistband and holding his hand as if gripping a weapon, told Jenkins to turn around and walk away. All the while, Simpson and an unidentified woman hurriedly loaded the stolen merchandise into a car. Jenkins felt threatened by Wells and backed away, not wanting to turn his back on him. Wells continued to walk towards Jenkins, repeatedly telling him to back away and leave. At some point, Jenkins turned around in an attempt to get the license plate information off the car Simpson was loading just behind Wells. Again, Wells walked towards him menacingly and told him to back off and go away. Then, both defendants and the unidentified woman got into the car loaded with stolen merchandise and fled the parking lot.

Simpson claims, as she did at trial, that she did not know Jenkins was pursuing her as she left the store and Jenkins never identified himself as store security. Whether Simpson knew Jenkins was following her as she left the store is of no consequence. When she arrived at the car, Jenkins immediately identified himself as store security and instructed her to return to the store with him. At that moment, Wells intervened and threatened Jenkins, attempting to scare Jenkins off so that Simpson could load the car with the stolen merchandise.

Simpson also claims she was unaware of what Wells was saying to Jenkins in the store parking lot. To the contrary, the evidence supports a reasonable inference that Simpson, having just been contacted by Walmart security and told to return to the store, was well aware that Wells was trying to frighten Jenkins off so she could quickly load the stolen merchandise into the car and flee the scene with Wells. "[T]he willful use of fear to retain property immediately after it has been taken from the owner constitutes robbery. So long as the perpetrator uses the victim's fear to accomplish the retention of the property, it makes no difference whether the fear is generated by the perpetrator's

20

specific words or actions designed to frighten, or by the circumstances surrounding the taking itself." (*People v. Flynn* (2000) 77 Cal.App.4th 766, 772.) Here, Wells generated the fear by threatening Jenkins so that Simpson could quickly load the stolen merchandise into the car.

There is sufficient evidence to support Simpson's conviction for second degree robbery of Walmart.

## 7.0 Ineffective Assistance of Counsel—Simpson

Simpson claims she received prejudicially ineffective assistance from her trial counsel who (1) urged her to testify based on an erroneous belief that certain evidence would not be used to impeach her and (2) told the jury her testimony was not credible.

To establish ineffective assistance, defendant bears the burden of showing (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms, and (2) absent counsel's error, it is reasonably probable that the verdict would have been more favorable to her. (*Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674]; *People v. Bell* (1989) 49 Cal.3d 502, 546.)

On appeal, we "must reject a claim of ineffective assistance of counsel if the record 'sheds no light on why counsel acted or failed to act in the manner challenged . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . .' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1216-1217.)

7.1 Background

Defendants' respective counsel and the trial court held pretrial discussions regarding the use of recorded jailhouse telephone conversations that had yet to be reviewed in their entirety by the prosecution or either defendant's counsel. The

21

recordings included conversations between Simpson and various individuals, including Thomas Galindo (her son's father) and Myron Armstrong.

During those pretrial discussions, the prosecutor stated in part: "[T]here's nothing in those calls I would seek to use in my case . . . . [¶] . . . [¶] The only way that [the recordings] would be relevant in my estimation to the defense is if either of the defendants were going to testify. I understand that potentially there would be some impeachment that they would probably want to review so they weren't surprised by it. So that would be the reason for them to review it. Because, like I said, I have no reason to believe that there's anything in those calls *that I would use in my case-in-chief*." (Italics added.) Defendants' respective counsel both requested time to listen to the recorded calls. When the court asked whether defendants would enter a time waiver for that purpose, Simpson's counsel indicated Simpson was "not willing to waive time." The following colloquy ensued:

"DEFENDANT SIMPSON: I think both of us are intelligent enough people to know whether or not we would harm ourselves in what we said on the telephone. This case has gone on a long time. We've been here for more than nine months.

"I don't feel as if I have anything that I need to hide with the telephone calls. They listened and he doesn't feel the need to use them. I don't feel the need to wait.

"THE COURT: And I understand that, but the consideration that remains is your lawyer's full and complete knowledge of the content of the calls and estimation as to whether or not the contents could at some point in the future, based upon a change of circumstances, present some form of detriment to you.

"In other words—and I understand what you're saying, hey, you participated in the calls, you know what was said on your part. I don't know about Mr. Wells. But seated next to you is the person responsible for driving this vehicle, so to speak.

22

"DEFENDANT SIMPSON: Uh-huh.

"THE COURT: And he doesn't know what was said and he doesn't know under what context. And what you have to understand is without a full and complete knowledge of the case and the law, he's responsible for ensuring that nothing on that tape can come back to hurt you. Or if something is on there that might help you, he needs to know that too. And that decision on your part is denying him the opportunity to make an assessment of the benefit and the burden of the content.

"DEFENDANT SIMPSON: For my own personal, I don't feel the need, but if my codefendant—

"DEFENDANT WELLS: I don't either. I don't either.

"DEFENDANT SIMPSON: We've been prepared, Your Honor, we've been prepared since November 5th to begin trial.

"THE COURT: I understand that.

"DEFENDANT SIMPSON: I'm pretty sure that anything that these telephone contents would—

"THE COURT: And you know what, I'm not here to press you into a particular decision. That's not my role, and that would be inappropriate to do that. So don't take my comments as trying to say, hey, that's just a bad decision, you need to rethink that. Your decision is your decision.

"But I have to take—but understanding something, understanding something, is that I have to take into account both your and Mr. Wells's requests and concurrently take into account your lawyers' ability to adequately represent you. And if they're at cross-purposes, then as a judge, I have to step back and make the best decision I can, even though it may not follow what you want. I just want you to understand that.

23

"DEFENDANT SIMPSON:  Okay.

"THE COURT:  Okay.  All right.  So without regard to a change in perspective from Mr. Wells, which I'm sensing I'm now receiving, it doesn't change anything if Ms. Simpson's position is she does not want to waive time.

"DEFENDANT WELLS:  Neither do I.

"THE COURT:  Okay.  Fair enough.  I'm take [*sic*] it as that.

"DEFENDANT WELLS:  Thank you.

"THE COURT:  But understand, as I just explained, I'm also responsible for making sure that your lawyer's 100 percent fully ready to represent you in all aspects. And I cannot conclude that if he is not or they have not had a chance to look, listen to these tapes to ensure that there's nothing of a burden or nothing of a benefit that lies in their content.

"So there's not going to be a time waiver under [section] 1382, but clearly there is, in my opinion, good cause to continue this to next Wednesday to allow your attorneys the opportunity to ensure that they are advised of the content of these tapes and they can take that content in terms of their trial strategies."

At trial, Simpson testified on direct examination that Allenbaugh let her borrow two of his guns to use as collateral for drugs she purchased from her drug dealer. However, when she told Allenbaugh she was unable to sell enough drugs to earn back the collateral as promised, Allenbaugh was "livid."  He, Simpson, and Wells then drove to the dealer's apartment in an unsuccessful attempt to obtain the borrowed guns.  When Allenbaugh learned the dealer was not going to return the guns, he became angry and started walking back home.  Simpson eventually picked him up and drove him to his apartment, where he and Simpson smoked some methamphetamine together before

24

Simpson left. Simpson denied any participation in robbing Allenbaugh or that a robbery occurred at all.

On cross-examination, Simpson testified that Wells "still holds a pretty special place in [her] heart," and that Wells was friendly with Galindo, the father of her child. Simpson also testified, "[Wells] never held a gun to me. I've never seen Mr. Wells with a gun." "I have never at any point, as long as I've known Mr. Wells, been afraid of him." In order to impeach that testimony, the prosecutor questioned Simpson regarding her recorded jailhouse telephone calls. Simpson admitted saying a number of things during her recorded conversations, but claimed "75 percent of my jail calls are all lies, all trying to attempt [to obtain] legal counsel," including her statement to Galindo that she desperately wanted to leave Wells but was afraid that he was going to kill her family. She testified she was referring to her drug dealer, not Wells, when she told Galindo in one particular telephone conversation, "So he put a gun to my head and he made me help him," and said, "He's gonna have to tell them that he put a gun to my head and he made me help him."

During a brief recess, the following colloquy took place outside the presence of the jury:

"[COUNSEL FOR SIMPSON]: "My understanding [the prosecutor] wasn't going to use phone calls at all. Now all the sudden we're getting phone calls used and we're getting into domestic violence. This seems to be so prejudicial. I'm not sure what the [prosecutor] is trying to do other than prejudicing the jury at this point. [¶] . . . [¶]

"[THE PROSECUTOR]: I guess my first response is that this is—all these calls are contained in a CD that was discovered many months ago to both defense attorneys. I'm certainly not asking about any questions I don't know are addressed on the phone calls.

25

"I, quite frankly, didn't intend to get into the domestic violence issues until Ms. Simpson was nonresponsive to my questioning and said that basically she's never felt fear of Mr. Wells. I mean, I have multiple phone calls where she's crying saying that Mr. Wells is threatening to kill her entire family if she—if she leaves him where—and she admitted to the—some of the content where she told this—her son's father that Mr. Wells was tracking him by way of GPS.

"Also, she said that she never saw Mr. Wells with a gun, never knew him to have a gun. There's another phone call where she says very specifically that he always has a gun and he's not reluctant to use it, and she knows it, she's seen it.

"These are all things that are becoming relevant through—and admissible through—her testimony. This is—these are calls that [Simpson's attorney] says that I said I wasn't going to introduce any calls. I very clearly said I wasn't going to introduce any calls aside from the one that was introduced in my case-in-chief. However, this is—this is—it wouldn't be admissible, these calls, because they're really, they're relieving Ms. Simpson of responsibility potentially and they're incriminating Mr. Wells, but now that she's testified it's all impeachment to her testimony. So I certainly didn't misrepresent anything. I didn't use these calls in my case-in-chief, and now they have become admissible.

"[COUNSEL FOR SIMPSON]: "Well, that's not what I understood. I understood they were not going to be used, period, case-in-chief or not. That was my understanding.

"THE COURT: When would a prosecutor ever promise never to use evidence that he or she might have against a defendant in advance of knowing whether or not that the defendant's (A) going to testify or (B) what that defendant's going to say?

"I'm not saying that that wasn't your understanding, but it just seems to be misplaced in terms of how we all know this system works and this process works.

26

"Honestly, my analysis is I would never have allowed the prosecution to bring this in had Ms. Simpson not taken the stand. But having done so, she's placed her credibility directly in issue to include the ability of the prosecution to impeach her with evidence that they do have with inconsistent—inconsistent positions and inconsistent statements.

"She's testified that not knowing Mr. Wells to be a gun-carrying violent individual, and now it turns out the prosecutor has her own statements that are absolutely inconsistent with that. I don't see why that wouldn't be (A) relevant and (B) probative of her credibility. I'm hard to see your position.

"I mean, I agree with your position a hundred percent, had she not taken the stand. But having now done so and attempted to cloak herself and Mr. Wells with an impression in front of the jury of essentially a docile individual that would not engage in any form of misconduct or, you know, use or possess a firearm and, lo and behold, the prosecutor has her statements to the contrary.

"So, within reason, I think [the prosecutor's] on a path that he's entitled to move forward on."

7.2.    Analysis

Simpson argues her trial counsel contributed to her decision to testify by erroneously assuring her the prosecution would not use her recorded jailhouse telephone conversations against her. However, Simpson concedes that the prosecutor indicated "he would not be using the calls in his case-in-chief, *but that the 'tapes' could be used for impeachment purposes*." (Italics added.) In that regard, the prosecutor stated the calls would be relevant "if either of the defendants were going to testify." Simpson was present for and participated in those discussions. Indeed, despite the court's words of caution regarding the potential that the calls could be detrimental to her defense, she insisted she and Wells "are intelligent enough people to know whether or not we would harm ourselves in what we said on the telephone." She added, "I don't feel as if I have

27

anything that I need to hide with the telephone calls." Simpson nonetheless elected to testify and make statements contrary to the contents of her recorded telephone conversations, thus subjecting herself to impeachment on cross-examination.

Next, Simpson claims defense counsel was prejudicially ineffective when he stated, in closing argument, that "most, but not all, of [Simpson's] testimony was simply not credible, it was not believable." Were that statement taken in isolation, the claim might have merit. However, when considered together with the rest of closing argument, it is clear defense counsel's decision was a tactical one. For example, defense counsel explained to the jury that Simpson still "ha[d] feelings" for Wells and "she was simply trying to protect [Wells] and was doing everything she could to deflect the blame from him" by testifying that Wells "wasn't bad to [her]; he wasn't physical with [her]; he didn't put a gun to [her] head; he didn't do any of that." Counsel told the jury the jailhouse recordings told "a more accurate picture" of Simpson's relationship with Wells prior to commission of the subject crimes, stating "Simpson was scared to death of [Wells] and was trying to break free of his grasp and control, even as he threatened her and her family. [¶] . . . [¶] . . . [W]hat you find, if you choose to listen to the tapes, is that [defendant] Simpson was forced at gunpoint to commit the robbery at James Allenbaugh's apartment. She acted under duress because she feared for her life, she feared for her family. She knew what [Wells] was capable of." Counsel also pointed out various portions of Simpson's recorded jailhouse statements to support his defense that Simpson's honest statements demonstrate she was acting under duress and was forced to participate in the robbery of Allenbaugh.

Given Simpson's election to testify, and the many contradictions between her trial testimony and her recorded jailhouse telephone conversations, there is a satisfactory explanation for counsel's argument. We are convinced that Simpson did not suffer prejudice by virtue of defense counsel's tactical argument.

28

**8.0 Substantial Evidence to Support First Degree Robbery (Count One) Conviction—(Simpson)**

Finally, Simpson contends there was insufficient evidence to support her conviction for first degree robbery of Allenbaugh (§ 211—count one). She claims there was no evidence (such as photographs or receipts) to corroborate the list of items stolen, other than Allenbaugh's testimony which, according to Simpson, was unreliable because it contained "numerous inconsistencies" and "he had a motive to fabricate a story." She also claims Allenbaugh's sister could have, but did not, corroborate Allenbaugh's testimony with her own testimony.

Again, a defendant forfeits her claim if she fails to present an analysis of the facts and legal authority on each point made, or to support the analysis with appropriate citations to the material facts in the record. (*Duarte*, *supra*, 72 Cal.App.4th at p. 856.) In Simpson's supplemental brief, she cites to several pages of Allenbaugh's testimony regarding the stolen items, but she provides no analysis regarding the "numerous inconsistencies" in Allenbaugh's testimony or his "motive to fabricate a story."

Moreover, "[t]he testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent or false as to other portions." (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 366.) In deciding whether substantial evidence supports the trial court's findings, we do not evaluate the credibility of witnesses; that is a matter left exclusively to the trier of fact. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) "[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young*, *supra*, 34 Cal.4th at p. 1181.)

Simpson opines, without analysis, that Allenbaugh's testimony was unreliable. However, "[t]he trier of fact may believe and accept a portion of the testimony of a witness and disbelieve the remainder." (*People v. Thomas* (1951) 103 Cal.App.2d 669, 672.) On review, we must accept that portion of Allenbaugh's testimony which supports

29

the judgment, "not that portion which would defeat, or tend to defeat, the judgment." (*Ibid.*)  In other words, "[o]ur function is to determine whether the evidence, *if believed*, is of sufficient character to justify conviction."  (*People v. Whitehurst* (1952) 112 Cal.App.2d 140, 144, italics added.)

The evidence here is sufficient to justify Simpson's conviction for robbery. Allenbaugh testified he owned 10 guns he kept in the gun cabinet he inherited from his father, a Taurus nine millimeter he "got . . . for [his] birthday in the '80's sometime" and kept in between his couch cushions, and several other guns in various places in his apartment.  He also had a coin collection.  During the robbery, he noticed Wells was using his Taurus nine millimeter.  Allenbaugh further testified that, at Wells's direction, Simpson broke into the locked gun cabinet.  Once Simpson and Wells left, he looked around his apartment and discovered the handle of the gun cabinet was broken and "all [his] guns were gone," including those not kept in the cabinet.  He also noticed "jewelry and some coins were gone."

According to Deputy Painter's testimony, Allenbaugh reported "approximately 14 firearms" were missing, including "a Taurus nine-millimeter semiautomatic handgun, a Marlin Firearms .22 long rifle, approximately three of them, . . . two Browning semiautomatic shotguns.  A Remington shotgun.  A Sears brand 12-gauge shotgun.  A Calico Arms M100 .22 long rifle.  And two . . . or three home-built black powder rifles." Allenbaugh told Deputy Painter he kept some of the guns in the gun cabinet, the only gun that was registered was the nine-millimeter handgun, and "many of [the guns] were heirlooms handed down from family."  Allenbaugh also reported that Simpson "grabbed [his] laptop computer and some collectable coins that [he] kept," although Allenbaugh could not identify the make or model of the computer.

We conclude there was sufficient evidence to support Simpson's conviction for first degree robbery of Allenbaugh.

30

## DISPOSITION

The judgments against defendant Wells and defendant Simpson are affirmed.  We direct the trial court to correct defendant Wells's determinate and indeterminate abstracts of judgment as set forth in part 4.0 of this opinion, and to forward copies of the corrected abstracts to the Department of Corrections and Rehabilitation.


                                          BUTZ          , J.


We concur:


      RAYE          , P. J.


      HULL          , J.